Leon RABORN *v.* R. M. BUFFALO et ux

76-122 542 S.W. 2d 507

Opinion delivered November 1, 1976

 

*Tom Tanner,* for appellant.

*Charles A. Walls, Jr.,* for appellees.

GEORGE ROSE SMITH, Justice. This is a boundary line dispute. The chancellor, in fixing the boundary in accordance with certain fences and iron pins, relied upon acquiescence in the boundary line (and to a lesser extent upon adverse possession) that continued from 1953 until 1971, this suit being filed in 1975. The pivotal issue is whether the chancellor's conclusions are correct in view of the fact that during the 18-year period in question the right to possession along the disputed line was primarily vested in life tenants rather than in fee simple owners.

The really material facts are not in dispute. The appellant, Leon Raborn, and the principal appellee, Dorothy Buffalo, are brother and sister. The disputed boundary runs east and west and is three quarters of a mile long. Leon owns the three contiguous forties that lie along the north side of the line. Dorothy and her husband own the corresponding three contiguous forties that lie along the south side of the line.

In 1953 Leon and Dorothy's parents, George Raborn and his wife, owned all the six forties except the middle one south of the line. On January 6, 1953, the elder Raborns conveyed the three northern forties to Leon and the two southern forties to Dorothy. Both deeds reserved a life estate in the grantors as long as either of them should live. George Raborn survived his wife and owned the life estate until his death in 1971. In 1955 the Buffalos acquired their middle forty by purchase from a third person.

During the pertinent years the two western forties and

the two middle forties were in cultivation; the two eastern forties were in woods. There was a meandering fence through the woods, north of the true line, but at the trial the Buffalos' attorney readily conceded that it was "a fence of convenience" and did not mark the boundary. The chancellor, however, fixed the line through the quarter mile of woods by drawing a straight line from an iron pin at the eastern end of that fence to another iron pin at its western end.

Along the remaining half mile of the disputed boundary, dividing the four forties to the west, there was a fairly straight fence lying north of the true dividing line. The chancellor, relying upon acquiescence and adverse possession, fixed the boundary along that fence line.

We consider first the disputed boundary between the two middle forties, for here the Buffalos' claim of title by acquiescence is bolstered by their claim of title by adverse possession. The facts are that from 1953 until 1971 the elder Raborn, under the reserved life estate, was in possession of the tract north of the fence. After the Buffalos' purchase of their middle forty in 1955 they were continuously in possession of that tract, up to the fence. Upon this proof the chancellor fixed the fence line as the boundary.

Under our decisions the Buffalos' claim of title by adverse possession must fail. The elder Raborn's possession was solely attributable to his life tenancy, his son Leon being the remainderman. The Buffalos, it is true, were asserting title from a completely independent source, hostile both to the life tenant and to the remainderman. Even so, adverse possession was not effective against the remainderman until the termination of the life estate. Our statute with regard to the recove. y of land provides that the action must be brought within seven years after the right to maintain the suit shall accrue. Ark. Stat. Ann. § 37-101 (Repl. 1962). In view of that language we have held, upon facts like those now before us, that the statute does not begin to run against the remainderman until the termination of the life tenancy. *Heustess* v. *Oswalt,* 253 Ark. 730, 488 S.W. 2d 707 (1973); *Hayden* v. *Hill,* 128 Ark. 342, 194 S.W. 19 (1917). Thus the appellees' claim of title by adverse possession cannot be sustained.

The same conclusion must be reached with respect to the Buffalos' claim of title by mutual acquiescence in the fence line. The principle of title by long acquiescence in a boundary rests upon the assumption of an implied agreement. We have said that in such circumstances "the law will presume an agreement concerning the boundary," and that by their long acquiescence the adjoining landowners "apparently consent" to the line. *Stewart* v. *Bittle,* 236 Ark. 716, 370 S.W. 2d 132 (1963). There being no indication in the proof that the elder Raborn acted or had authority to act for his son Leon, the remainderman, it follows that any acquiescence on the part of the father would not be binding on the son.

What we have said also disposes of the controversy with regard to the east one third and the west one third of the disputed line. In both instances the elder Raborn was in possession, as life tenant, of the forties on each side of the disputed line. If he could not bind the remainderman by acquiescence in a line being adversely asserted by someone else, obviously his acquiescence in his own possession on both sides of the line would be even more ineffective.

The decree is reversed and the cause remanded for the entry of a decree fixing the boundary line in accordance with the original Government survey, as shown by the appellant's proof.

We agree. HARRIS, C.J., and FOGLEMAN and JONES, JJ.